**DIRENZO COAL COMPANY,**
Petitioner,

v.

**DEPARTMENT OF GENERAL SERVICES, Bureau of Purchases,**
Respondent.

Commonwealth Court of Pennsylvania.

Argued March 31, 2003.

Decided June 3, 2003.

---

Richard J. Wiest, Pottsville, for petitioner.

Peter M. Good, Harrisburg, for respondent.

BEFORE: PELLEGRINI, Judge, FRIEDMAN, Judge and KELLEY, Senior Judge.

OPINION BY Senior Judge KELLEY.

Direnzo Coal Company (Direnzo) petitions this Court to review a determination of the Department of General Services, Bureau of Purchases (DGS) which, following an administrative hearing, denied Direnzo's letter of protest regarding bid specifications for the statewide anthracite coal contract. We affirm.

DGS procures anthracite coal on a statewide contract for all agencies under the Governor's jurisdiction, as well as some independent agencies. DGS issued a detailed bid specification, Anthracite Coal Specification C–80 (Specification C–80), setting forth technical requirements for coal vendors desiring to bid. Specification C–80, effective April 19, 2000, requires a 12.6% standard for ash content. Ash content is derived by dividing the heating value of anthracite coal by 1000 (B.T.U./1,000).[1] Prior to 1997, the allowable ash content for anthracite coal was 14%.

On June 22, 2000, Direnzo filed a bid protest with DGS pursuant to the Commonwealth Procurement Code (Procurement Code)[2] alleging, *inter alia*, that the 12.6% ash content specification is unduly restrictive and should be raised to 14%.[3]

---

1. For coal meeting the specification requirements for heat content of 12,600 B.T.U./1000, the allowable ash content is 12.6%.

2. 62 Pa.C.S. §§ 101–4509.

3. On June 30, 2000, DGS denied Direnzo's protest, without a hearing, and held that Specification C–80 was not unduly restrictive to contractors. From this decision, Direnzo filed a petition for review in our appellate

A hearing was held before a DGS administrative hearing officer, wherein both sides presented testimony and evidence. In the proposed report, the hearing officer concluded that DGS's implementation of Specification C–80 was not an abuse of discretion and recommended that Direnzo's bid protest be denied. The Secretary of DGS adopted the hearing officer's proposed report in its entirety and denied Direnzo's protest. This appeal now follows.[4]

Direnzo raises the following issues for our review:

1. Whether the hearing officer's findings are supported by substantial evidence?

2. Whether the hearing officer's decision is contrary to the Field Procurement Handbook?

3. Whether the hearing officer's decision is environmentally unsound and competitively restrictive and thus not in the best interests of the Commonwealth?

First, Direnzo contends that the hearing officer's finding of fact no. 10 is not supported by substantial evidence. We disagree.

■ Section 754(b) Administrative Agency Law provides, in relevant part, that the court shall affirm the adjudication unless "any finding of fact made by the agency and necessary to support its adjudication is not supported by substantial evidence." 2 Pa.C.S. § 754(b). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Rabinowitz v. Unemployment Compensation Board of Review*, 15 Pa.Cmwlth. 51, 324 A.2d 825 (Pa.Cmwlth.1974).

■ The presence of conflicting evidence does not mean that there is not "substantial evidence" to support the agency's findings. *Criswell v. Unemployment Compensation Board of Review*, 38 Pa. Cmwlth. 444, 393 A.2d 1071 (Pa.Cmwlth. 1978). It is the hearing officer who must resolve evidentiary conflicts, and it is not the function of the reviewing court to judge the weight and credibility of evidence. *Palmer v. Department of Public Welfare*, 5 Pa.Cmwlth. 407, 291 A.2d 313 (1972).

In the case before us, the hearing officer found:

Both at the hearing and in its brief filed after the hearing, Direnzo admitted that,

jurisdiction. By decision dated July 5, 2001, this Court held that Section 1711 of the Procurement Code removed bid protests from our original jurisdiction and determined that DGS should have given Direnzo reasonable notice of a hearing and the opportunity to be heard in accordance with Administrative Agency Law, prior to issuing a decision. *Direnzo v. Department of General Services*, 779 A.2d 614 (Pa.Cmwlth.2001). Accordingly, we vacated DGS's denial and remanded the matter to DGS for an administrative hearing. *Id.*

On December 3, 2002, the General Assembly repealed Section 1711 of the Procurement Code and added Section 1711.1, which provides that administrative law and procedure shall not apply to this section and that the head of the purchasing agency may, in his sole discretion, hold a hearing. Section

1711.1(e), (*l*) of the Procurement Code, *added by* the Act of December 3, 2002, P.L. 1147, 62 Pa.C.S. § 1711.1(e), (*l*). As Section 1711.1 was not in effect at the time of the hearing, we shall review this matter in accordance with Administrative Agency Law.

4. Our scope of review is limited to a determination of whether constitutional rights have been violated, an error of law has been committed, the procedures of the agency have been violated, or whether any necessary findings of fact made by the agency are not supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704. *See Estate of McGovern v. State Employes' Retirement Board*, 512 Pa. 377, 517 A.2d 523 (1986).

due to the existence of the Federal regulations governing ash content, ash content is a relevant factor to be considered by DGS in setting standards for the purchase of anthracite coal.

Reproduced Record (R.R.) at 133a. Direnzo contends that this finding is unsupported by the evidence as there are no federal or state regulations specifically governing the ash content of anthracite coal. While we agree that there are no regulations specifically governing the ash content of anthracite coal, federal and state regulations do govern particulate matter emissions.

Under the federal Clean Air Act, the Environmental Protection Agency (EPA) has promulgated national primary and secondary air quality standards for certain air pollutants, including particulate matter emissions. Particulate matter emissions is regulated through the EPA's Publication No. AP–42, Compilation of Air Pollution Emission Factors (AP–42).[5] AP–42 defines particulate matter emission as those emissions from anthracite coal combustion that are "a function of furnace firing configuration, firing practices ... and the *ash content of the coal.*" Supplemental Reproduced Record (S.R.R.) at 23b (emphasis added).

The Commonwealth has adopted environmental protection regulations relating to air resources for the attainment, maintenance and enforcement of federal standards, which are located in Title 25 of the Pennsylvania Administrative Code (air resources regulations). 25 Pa.Code § 124.1. The purpose of the air resources regula-

tions is to provide for the control and prevention of air pollution in the Commonwealth and to provide guidance for the design and operation of sources. 25 Pa. Code § 121.2. "Air pollution" is defined as the:

presence in the outdoor atmosphere of any form of contaminant, including, but not limited to, the discharging from stacks, chimneys, openings, buildings, structures, open fires, vehicles, processes or any other source of any smoke, soot, *fly ash,* dust, cinders, dirt, noxious or obnoxious acids, fumes, oxides, gases, vapors, odors, toxic, hazardous or radioactive substances, waste or any other matter in such place, manner or concentration inimical or which may be inimical to the public health, safety or welfare or which is or may be injurious to human, plant or animal life or to property or which unreasonably interferes with the comfortable enjoyment of life or property.

Section 4003 of the Air Pollution Control Act[6] (emphasis added). *See* 25 Pa.Code § 121.1.

The air resources regulations limit particulate matter emissions to a rate of .4 pounds per million BTUs of heat input. 25 Pa.Code § 123.11. Particulate matter is defined as "[a] material except uncombined water which is or has been airborne and exists as a solid or liquid at 70 F and 14.7 pounds per square inch absolute pressure." 25 Pa.Code § 121.1.

While state and federal environmental regulations do not specifically regulate the "ash content" of fuel,[7] they do regulate the

---

5. This publication is available at *http://www.epa.gov/ttn/chief/ap42/.*

6. Act of January 8, 1960, P.L. (1959) 2119, *as amended,* 35 P.S. § 4003.

7. We note that the Anthracite Standards Law, Act of May 31, 1947, P.L. 368, *as amended,* 73

P.S. §§ 261–269, which was enacted by the General Assembly for the protection of consumers and trade purchasers in the purchase of anthracite for fuel purposes, identifies "Standard Anthracite" as anthracite which does not exceed an ash content of: 11% for anthracite the size of egg, stove, and nut;

particulate matter emissions. DGS's witnesses testified that the ash content of coal, specifically fly ash, is a relevant factor in controlling particulate matter emissions. We, therefore, conclude that the hearing officer's finding that ash content is a relevant factor to be considered by DGS in setting standards for the purchase of anthracite coal is supported by substantial evidence in the record.

■ Direnzo further challenges this finding on the basis that the hearing officer erroneously attributes this finding to Direnzo. While Direnzo concedes that particulate matter emissions are regulated and that federal and state regulations may play an incidental role in ash emission issues, Direnzo did not testify that the ash content of fuel is "governed" by the regulations. However, such attribution constitutes harmless error as it was not a finding necessary to support the hearing officer's adjudication. *See Monaghan v. Board of School Directors of Reading School District*, 152 Pa.Cmwlth. 348, 618 A.2d 1239, 1243 (1992) (In order for the reviewing court not to affirm the adjudication, the finding of fact must be unsupported and necessary to the adjudication; an unsupported finding of fact which is not necessary to the adjudication merely constitutes harmless error.).

Next, Direnzo contends that Specification C–80 is contrary to the Field Procurement Handbook because the 12.6% ash content specification exceeds the Commonwealth's "minimum needs" and represents an unnecessary bidding obstacle for coal contractors. We disagree.

■ Section 301 of the Procurement Code, 62 Pa.C.S. § 301, authorizes DGS to formulate a procurement policy governing the procurement of supplies for executive and independent agencies. Pursuant to this authority, DGS created a procurement policy known as the "Field Procurement Handbook" (Handbook). The Handbook sets forth criteria for developing bid specifications. The following sections are of relevance to this discussion:

**F. Proprietary Specifications.** Since the purposes for competitive bidding require that all responsible bidders shall have the opportunity to compete, a specification which has the effect of putting unnecessary obstacles in the way of those who may want to bid is faulty and illegal. A proprietary specification has the effect of severely restricting competition. The fact that only one bidder may be able to meet the requirements of the specification does not, in and of itself, make the specification invalid.

**1. Legitimate Needs v. Mere Preferences.** The Commonwealth should through the procurement seek to meet legitimate and valid needs and specifications should represent a bona fide attempt to satisfy those needs. "Real needs" refer to an item which will fully satisfy the agency's needs and not affect mere preferences. Anything desired which would exceed *minimum needs* is subject to question. If there is a legitimate and valid need, the specification is not faulty even if only one manufacturer makes the item which meets the specification.

**2. Discretion in Preparation of Specifications.** The Commonwealth

12% for anthracite the size of pea; and 13% for anthracite the size of buckwheat and rice. Section 2(g) of the Anthracite Standards Law, 73 P.S. § 262(g). "Ash Content" is defined as "the percentage which the weight of the ash from anthracite, resulting from burning,

bears to the weight of the anthracite before burning after the anthracite has been dried for one hour at 105 degrees centigrade." Section 2(h) of the Anthracite Standards Law, 73 P.S. § 262(h).

has some latitude of discretion in preparing the specifications. Unless specifications are prepared in a hasty or capricious manner, or are not founded upon the exercise of a reasoned judgment, and absent fraud or collusion, courts will not disturb an award.

Handbook, S.R.R. at 190a (emphasis added).

DGS has discretion to prepare necessary specifications to meet its minimum needs. As addressed above, the change in the maximum allowable ash content from 14% to 12.6% was developed in order to ensure compliance with federal and state regulations pertaining to particulate matter emissions. Therefore, Specification C–80 reflects the legitimate needs of the Commonwealth. While many anthracite-burning facilities within the Commonwealth maintain some type of particulate remediation device to reduce ash emissions from burned coal, the hearing officer found that the ash remediation devices do not give uniform control over particulate emissions. R.R. at 133a–134a. Absent any evidence that Specification C–80 was prepared in a hasty or capricious manner, or was not founded upon the exercise of reasoned judgment, we conclude that Specification C–80 is not contrary to the Handbook and represents a valid exercise of DGS's discretion.

Direnzo further contends that the hearing officer's decision is environmentally unsound on the basis that lower ash coal is higher in sulfur. We disagree.

■ Specification C–80 regulates both sulfur and ash to ensure compliance with regulations governing each pollutant. Assuming that lower ash coal is higher in sulfur as alleged, DGS is acting within its discretion to prioritize reduction in ash emissions over sulfur emissions as long as the sulfur emissions remain within acceptable legal limits. As 12.6% coal meets the prescribed environmental standards governing air pollution for sulfur, Specification C–80 cannot be environmentally unsound as a matter of law.

Lastly, Direnzo further contends that the hearing officer's decision is competitively restrictive and thus not in the best interests of the Commonwealth. We disagree.

A specification must seek proposals that meet an agency's minimum needs, or else the solicitation represents an undue, improper restriction on competition. See Handbook, S.R.R. at 190a. In essence, a specification must have a rational relationship to the agency's needs, must not be unduly restrictive, and should be written in as non-restrictive a manner as possible in order to enhance competition and invite innovation. "The fact that only one bidder may be able to meet the requirements of the specification does not, in and of itself, make the specification invalid." Handbook, S.R.R. at 190a.

Herein, the hearing officer found that DGS approved 28 coal companies to supply anthracite coal to the Commonwealth under Specification C–80. Based upon our review, the requirements contained in Specification C–80 are broad enough to allow competitive bidding to ensure that the Commonwealth receives the best pricing for its statewide coal needs while meeting the environmental standards of DEP. We, therefore, conclude that the hearing officer did not err in determining that Specification C–80 is not competitively restrictive.

### ORDER

AND NOW, this 3rd day of June, 2003, the order of the Secretary of the Department of General Services, dated Septem-

ber 20, 2002, denying Direnzo Coal Company's bid protest, is affirmed.